IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STACY COX,<br><br>        Plaintiff,<br><br>    vs.<br><br>FIRST NATIONAL BANK,<br><br>        Defendant. | CASE NO. 8:13CV126<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 40) submitted by Defendant First National Bank ("First National"). For the reasons stated below, the motion will be granted.

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts were presented in the parties' briefs and supported by pinpoint citations to admissible evidence[1] in the record. The parties have admitted these facts, or have not controverted them as required by NECivR 56.1[2] and Fed. R. Civ. P. 56.

First National is a family-owned company. It is the largest privately owned banking company in the United States and one of the largest family-owned holding companies in the United States.

In 2008, Plaintiff Stacy Cox ("Cox") was recruited to work at First National as a Vice President. During the recruitment process, she was told she would have the

---

[1] First National objects to the Court considering evidence presented by Cox that was not properly authenticated or constitutes inadmissible hearsay. The Court will not give weight to such evidentiary materials.

[2] "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1).

opportunity to be considered for the position of Senior Vice President of Operations, but she was not guaranteed that position. She began her employment at First National in September of 2008 as Vice President of Loan Operations.

Dave Downing ("Downing"), First National's former Senior Vice President of Operations, hired Cox and acted as her supervisor from the time of her hire until May 2011. In the spring of 2011, Downing's direct reports were Cox and three males, Jon Doyle ("Doyle"), Scott Irwin ("Irwin"), and Dave Nutty ("Nutty").

First National conducted performance evaluations of its employees and gave them overall rankings of "Exceeds Expectations," "Meets Expectations," "Developing Toward Expectations," or "Unacceptable." Cox received an overall evaluation of "Meets Expectations" on the two performance evaluations she was given during her employment with First National, preceding the incident giving rise to this action. In the same time period, Doyle received an overall evaluation of "Exceeds Expectations" one year and "Meets Expectations" the next.

First National also conducted "Talent Inventories," to assess which individuals should fill certain roles. The Talent Inventory for Doyle, completed in 2009, specified that he likely would be ready to take over Downing's role in one to three years. The 2009 Talent Inventory for Cox, completed three to four months into her employment with First National, specified that she was ready to take over Doyle's role,但 did not specify when or if she would be ready to take over Downing's role.

2

In the spring of 2011, Downing announced his retirement. First National did not have any formal job description for Senior Vice President of Operations; nor did it have a protocol or procedure concerning promotions; nor did it create an internal or external job posting for the position. The two primary candidates for Downing's position were Cox and Doyle. Doyle had been employed with First National for ten years, and Cox had worked there less than three years. Downing provided Dan O'Neill ("O'Neill"), President of First National, with a matrix[3] on which Downing ranked potential candidates for his position. Downing scored Doyle higher than Cox on the matrix. O'Neill did not directly supervise Cox or Doyle any time prior to May 2011, nor did he interview Cox or Doyle for the position of Senior Vice President of Operations.[4] O'Neill promoted Doyle to Senior Vice President of Operations in May 2011.

---

[3] The parties do not identify the specific criteria listed on the matrix, but neither party has claimed that the content of the matrix is a disputed material fact. The matrix in question is handwritten, and no party suggests that First National had any policy of using such matrices routinely when filling positions. The categories appear to include leadership, domain knowledge, maturity, peer respect, managerial acceptance, project management skills, and risk. All other categories being equal, Cox scored one point higher than Doyle under the category that appears to read project management skills, while Doyle scored one point higher for leadership, peer respect, and managerial acceptance. (Filing No. 56-19.);(*see* Reply Br., Filing No. 58 at ECF 30) ("The matrix created by Downing shows his thoughts on the most important skills for his position, including leadership, domain knowledge, maturity, peer respect, managerial acceptance, and management skills.")

[4] First National does not dispute that Downing underwent several interviews with First National representatives before he was hired as Senior Vice President of Operations. However, First National notes that Downing was an external candidate when he interviewed, while his potential replacements, at the time they were being considered, were not. (Filing No. 49 at 7 n. 1.) Cox underwent thirteen interviews with First National executives, including six senior management executives, when she sought the position of Vice President of Loan Operations,.

At the relevant time, Cox had a graduate degree in banking from the Bank Administration Institute and an MBA from the University of Nebraska, and Doyle did not have any graduate degrees. Cox had approximately 24 years of experience in bank operations, and Doyle had at least 4.5 years of experience in bank operations.[5] Cox had approximately 19 years of experience with commercial loan operations, 21 years of experience with mortgage loan operations, and had served as Vice President of Loan Operations at First National. Doyle had no experience in loans.

At the time O'Neill promoted Doyle, 18 people reported directly to O'Neill, and only one was female. Of the 12 members of First National's Board of Directors, only one was female. Of the 15 executive officers at First National, only one was female.

First National gave Cox a raise in May of 2011. She was not subjected to any offensive or hostile workplace conduct. She was informed by several executives that she was a valued employee at First National, and was never asked to leave her employment. She resigned in September 2011.

## DISPUTED FACTS

Cox asserts additional facts, supported only by her own affidavit and/or deposition:

---

[5] Cox claims Doyle had approximately 4.5 years of experience in bank operations as of May 2011. First National disputes this fact, indicating that Doyle may have more experience, but First National does not direct the Court to any evidence in the record proving that Doyle's operations experience exceeded 4.5 years.

4

Human Resources manager, Aura Krist, former vice president at First National, told Cox that First National was a "white man's organization" and that she was sorry that Cox had not received the promotion. (Pl. Dep., Filing No. 42-1 at 94:12-16.)

Joe Kelly, former vice president at First National, told Cox he felt she was more qualified than Doyle for the position of Senior Vice President of Operations, and he communicated his frustration that "First National's structure didn't support women advancing to executive levels" which was "obvious based upon [First National's] structure." (*Id.* at 94:21-93:1.)

First National's Chief Credit Officer, Jerry O'Flanagan, told Cox that O'Neill's decision to promote Doyle over Cox sent "reverberations" throughout First National's executive team, because they had not been consulted about it, and many members of the executive team were very angry.[6] (Pl. Aff., Filing No. 56-1 at ECF 6 ¶24.)

## STANDARD OF REVIEW

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint*, 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "Summary Judgment is not disfavored and is

---

[6] O'Flanagan testified that he did not remember making such a statement. (O'Flanagan Dep., Filing No. 43-6 at 20:3-22:16.)

5

designed for every action."⁷ *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n. 2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S.Ct. 513 (2011)) (internal quotations omitted). In reviewing a motion for summary judgment, the court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some

---

⁷ In this case, Cox cites *Lynn v. Deaconess Medical Center-West Campus*, 160 F.3d 484 (8th Cir. 1998), for the principle that "[s]ummary judgment should seldom be granted in discrimination cases . . . [b]ecause discrimination cases often depend on inferences rather than on direct evidence . . . ." (Pl. Br., Filing No. 57 at 20.) However, this holding in *Lynn* was abrogated by *Torgerson*, 643 F.3d 1031.

6

metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042 (internal quotation marks omitted). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1042) (internal quotations omitted). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)) (internal quotations omitted).

**DISCUSSION**

Cox argues that First National discriminated against her on the basis of her sex in violation of 42 U.S.C. §§ 2000e—2000e-17 ("Title VII"). Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

7

A plaintiff may establish a claim for sex discrimination through direct or indirect evidence. *Torgerson*, 643 F.3d at 1044. A plaintiff may survive a defendant's motion for summary judgment by producing direct or circumstantial evidence "'sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Id.* (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir.1997)). When a plaintiff presents direct evidence of discrimination, the court analyzes the claim under the mixed-motive standard set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). When a plaintiff presents indirect evidence of discrimination, the court analyzes the claim under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Cox argues that the Court should deny summary judgment under either analysis.

**I.  MIXED-MOTIVE ANALYSIS**

"Direct evidence of discrimination is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1044) (internal quotation marks omitted).

Cox claims First National's failure to establish objective hiring standards is direct evidence of discrimination. In support of this argument, she cites *Lockridge v. Bd. of Trustees of Univ. of Arkansas*, 294 F.3d 1010 (8th Cir. 2002). Her reliance on

*Lockridge* is misplaced. That opinion was vacated in *Lockridge v. Bd. of Trustees of Univ. of Arkansas*, 301 F.3d 958 (8th Cir. 2002). Further, on rehearing, the court expressly identified *Lockridge* as a case with "no direct evidence of discrimination . . . ." *Lockridge v. Bd. of Trustees of Univ. of Arkansas*, 315 F.3d 1005, 1010 (8th Cir. 2003). First National's alleged failure to establish objective hiring standards is not direct evidence of discrimination, and Cox has not established that her claim is governed by the mixed-motive standard found in *Price Waterhouse*.

## II.  BURDEN-SHIFTING ANALYSIS

Under the three-step analysis of *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Torgerson*, 643 F.3d at 1046. Once a prima facie case is established, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (quoting *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009)). Finally, if the employer articulates such a reason, the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination. *Id.*

Federal courts do not sit as a "super-personnel department" questioning fairness of business judgments made by an employer unless those judgments involve intentional discrimination. *Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 916 (8th Cir 2007) (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). "Although intermediate evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally

9

discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### A. Plaintiff's Prima Facie Case

To establish a prima facie claim of sex discrimination in a failure-to-promote case, a plaintiff must show: "(1) that she belonged to a protected class, (2) that she met the minimum qualifications and applied for the position, (3) that despite her qualifications she was denied the position, and (4) that her employer promoted a person of similar qualifications who was not a member of the protected group." *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1126 (8th Cir. 1998).

Cox, a female, belongs to a protected class. The parties do not dispute that she met the minimum qualifications and applied for the position of Senior Vice President. Nor do the parties dispute that she was denied the position. Doyle was a similarly situated male. Accordingly, Cox established a prima facie claim of sex discrimination, and the burden shifts to First National to offer a legitimate, non-discriminatory reason for its actions.

### B. First National's Legitimate, Non-Discriminatory Reason

A defendant's burden is then one of production, not persuasion; therefore, the determination that the defendant has met its burden "can involve no credibility assessment." *Reeves, Inc.*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)) (internal quotation marks omitted). A defendant's burden at

this juncture is "'not onerous,' and can be satisfied by showing that plaintiff, even if qualified, was a poor fit, or another candidate was a better fit for the job." *Sallis v. Univ. of Minn.*, 322 F. Supp. 2d 999, 1006 (D. Minn. 2004) *aff'd*, 408 F.3d 470 (8th Cir. 2005). Identification of the "strengths that constitute the best qualified applicant" is best left to employers. *Duffy v. Wolle*, 123 F.3d 1026, 1038 (8th Cir. 1997), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

Here, First National claims that Doyle was promoted to Senior Vice President of Operations "based on the fact that Doyle had been ranked higher on the matrix than Plaintiff and that Doyle had been with First National for a longer period of time." (Def. Br., Filing No. 41 at 15.)  Neither Cox nor Doyle had experience in every area of operations.  Doyle's experience was diverse,[8] while Cox's experience focused on loans. (Pl. Dep., Filing No. 42-1 at 35:22-36:6, 38:11-39:11, 146:23-147:21; Downing Dep., Filing No. 42-3 at 35:1-36:19; Cantrell Dep., Filing No. 43-2 at 31:5-32:13.)  Doyle received higher rankings on his formal performance evaluations, and his applicable "Talent Inventory" indicated he would soon be ready to take over the Senior Vice President of Operations position, while Cox's indicated she was ready to take over *Doyle's* role.  (Downing Dep., Filing No. 42-3 at 79:6-81:22, Ex. 25, Ex. 26 at ECF 27.)

---

[8] Downing testified that prior to Doyle's promotion, Doyle had experience in deposits (liabilities), trusts and wealth management, electronic banking in payments, administrative statements, and risk. Downing also testified that the only areas Doyle did not have experience in were assets and mail processing. (Filing No. 42-3 at 35:1-36:19.)

11

Based on the evidence discussed above, First National has met its burden of production by articulating legitimate non-discriminatory reasons for promoting Doyle instead of Cox.

### C. Plaintiff's Proffered Evidence of Pretext

Once a defendant satisfies its burden to articulate a legitimate non-discriminatory reason for its decision, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253) (internal quotation marks omitted). "[E]vidence of pretext and discrimination is viewed in light of the employer's justification." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)) (internal quotation marks omitted).

Cox alleges that the following are all evidence of pretext: (1) First National's inconsistent explanations for its promotional decision; (2) O'Neill's lack of awareness of Doyle's qualifications; (3) Cox's superior qualifications; (4) the male-dominated culture at First National; and (5) comments made by non-decision makers.

**(1) First National's Alleged Inconsistent Explanations**

"Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Smith*, 302 F.3d at 835 (quoting *Kobrin v. Univ. of Minn.,* 34 F.3d 698, 703 (8th Cir.1994)) (internal quotation marks omitted). Cox argues that First National proffered multiple explanations for failing to

12

promote her, and that the alleged changes in explanation constitute evidence of pretext. Specifically, she alleges that First National's General Position Statement to the Nebraska Equal Opportunity Commission ("NEOC") and O'Neill's deposition testimony were contradictory.

In First National's General Position Statement to the NEOC, First National explained its decision:

> As part of the process of succession, [O'Neill] . . . asked Downing to propose a slate of potential candidates. Because of the level of the position, there was no posting made. . . . Downing put together a matrix with his candidates and then went to his peer group, the Senior Leadership Team, which is all of O'Neill's direct reports, and asked them to rate the candidates on various attributes . . . O'Neill made the decision to promote Doyle over Cox and Irwin for the following reasons . . . . From the matrix that Downing prepared, Doyle scored higher than Cox and Irwin on leadership, peer respect and managerial acceptance, the last two being about relationships and ability to influence in order to get work done. In addition, O'Neill felt Doyle's personality and style would align better with the culture of the organization and the style of the leadership team, which in turn would equate to stronger relationships with his internal stakeholders. O'Neill felt that Doyle would be more effective at achieving three of his top five goals in 2011, and to lead the function longer-term.

(Filing No. 56-24 at 2.)

During his deposition, O'Neill testified that Doyle's tenure was "probably the most deciding factor" in making the promotional decision. (O'Neill Dep., Filing No. 42-2 at 22:4-7). Cox argues that O'Neill's explanation is inconsistent with the NEOC statement because he did not mention the matrix, the cultural fit of the organization, or ability to achieve goals. However, Cox ignores O'Neill's testimony explaining how he considered Downing's recommendation, by way of the matrix. (*Id.* at 19:9—20:6.) She also ignores

13

O'Neill's testimony explaining why he believed Doyle's tenure gave Doyle a slight edge over Cox, due to the upcoming mergers. (*See id.* at 21:5-22:7.) The Court finds O'Neill's statements to be consistent with the NEOC statement. Any difference in First National's proffered explanations is insubstantial and does not establish pretext. *See Smith*, 302 F.3d at 835.

### (2) O'Neill's Alleged Ignorance of Doyle's Credentials

Cox claims that O'Neill's ignorance of Doyle's lack of experience in consumer loans, mortgage loans, deposit operations, and risk, is evidence of pretext. Her argument is based on an unpublished opinion, *Bartlett v. Gates*, 421 F. App'x 485 (6th Cir. 2010). In *Bartlett*, the employer's proffered explanation for failure to promote the plaintiff was that the other candidate was the "best-qualified candidate for the position at issue." *Id.* at 492. That employer, however, "was unable to answer basic questions about the candidates' qualifications, including whether [the chosen candidate], whom she hired based in part on [the candidate's] 'significant experience in contract negotiations which was a critical function of the position,' had ever completed a single contract negotiation . . . ." *Id.*

In contrast, O'Neill was able to describe Doyle's experience as it related to those factors O'Neill considered important for the position, *i.e.,* tenure, relationships with employees, and relationships related to upcoming mergers. As noted above, "[i]dentifying strengths that constitute the best qualified applicant is . . . a role best left to employers . . . ." *Duffy*, 123 F.3d at 1038. First National did not claim that experience in

14

consumer loans, mortgage loans, deposit operations, or risk, was most important in selecting a Senior Vice President of Operations. Rather, First National repeatedly emphasized the importance of relationships and leadership. O'Neill's knowledge of Doyle's qualifications was consistent with First National's proffered reason for his promotion. O'Neill also explained in his deposition that he relied on the matrix provided by Downing, who had broad knowledge of Cox's and Doyle's comparative experience.

### (3) Cox's Alleged Superior Qualifications

In some discrimination cases, "qualifications evidence may suffice . . . to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). A plaintiff "might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position." *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989) *superseded on other grounds* by 42 U.S.C. § 1981(b). According to the Sixth Circuit, in cases where "there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 627-28 (6th Cir. 2006). The Eighth Circuit has also indicated that differences in qualifications do not give rise to an inference of discrimination or pretext when candidates are relatively similar. *See Torgerson*, 643 F.3d 1031.

Cox argues that her own "qualifications for the position obviously and greatly outweigh Doyle's qualifications." (Pl. Br., Filing No. 57 at 32.) She highlights her experience in loans and with bank mergers. As noted above, First National claims that tenure, relationships with employees, and relationships related to bank mergers were qualities it considered important to the Senior Vice President of Operations position.

At the time Doyle was promoted, both Doyle and Cox were at the Vice President level. (Filing No. 56-214 at 1.) There is no dispute that Cox was qualified for the Senior Vice President position. There is also no dispute that Doyle had a longer tenure at First National. At the time O'Neill made his decision, Doyle had been employed with First National for ten years, and Cox had been employed with First National for less than three years. There is no dispute that Downing ranked Doyle higher than Cox on the matrix. Specifically, Doyle was ranked higher under leadership, peer respect, and managerial acceptance. While Cox has identified several areas where her qualifications were superior to Doyle's, she has not demonstrated that those were the strengths First National considered most important for the role of Senior Vice President of Operations. In light of First National's proffered explanation for its promotional decision, Cox's alleged superior qualifications do not demonstrate pretext.

**(4) First National's Alleged Male-Dominated Culture**

Cox argues that First National's male-dominated culture, including the composition of its executive leadership, its Board of Directors, and its President's direct reports, shows pretext.

16

The statistical samples offered by Cox are small and do not represent similarly situated employees. Her samples are relevant to the issue of pretext, but alone are insufficient to support a finding of pretext.[9] "[W]here quantitative evidence does not alone demonstrate discrimination to some judicially created standard of statistical conclusiveness, it is still relevant in conjunction with all other evidence in determining intentional discrimination." *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1060 (8th Cir. 1988). Though the Court has considered the composition of First National's leadership teams, board of directors, and its President's direct reports as evidence of pretext, such evidence is insufficient for a reasonable jury to conclude that First National's proffered explanation for promoting Doyle was pretextual.

**(5) Alleged Comments By Non-Decision Makers**

Cox argues that comments made by non-decision makers are evidence of pretext. Specifically, she claims that First National's Senior Vice President of Human

---

[9] In order for statistical evidence to create a reliable inference of discrimination, the statistical sample size must be significant. Compare *Meyer v. Missouri State Highway Comm'n,* 567 F.2d 804, 810 (8th Cir. 1977) (finding intentional sex discrimination where none of the department's 2,000 employees was female), with *Eubanks v. Pickens–Bond Constr. Co.,* 635 F.2d 1341, 1350 (8th Cir. 1980) (ten finishers proved to be too small a sample to infer intentional discrimination from the statistical disparities in promotion of 14 finishers), and *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011) (noting that the "sample" consisted of only six applicants and, therefore, was "not the type of statistical disparity that can support an inference of discriminatory intent."). In the Eighth Circuit, "the adequacy of numerical comparisons within small sets of data depends on the degree of certainty the factfinder requires, as well as the type of inference the statistics are meant to demonstrate." *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1060 (8th Cir. 1988). "'[S]tatistics must evaluate comparable employees to be meaningful indicators of pretext' . . . and 'statistical evidence that does not reflect significant differences among employees would be prejudicial and misleading.'" *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 612 (8th Cir. 1997).

17

Resources, Michael Foutch ("Foutch") stated that Cox was more qualified than Doyle for the Senior Vice President of Operations position, but that Cox was not the right "cultural fit."[10] Cox argues that a reasonable jury could conclude that, in light of the other evidence of pretext, Foutch's use of the term "cultural fit" was related to Cox's sex. However, Cox has not offered any evidence supporting her claim that Foutch's comment, if made, was a reference to her sex.

Cox's 2008 performance appraisal included an evaluation of her "cultural integration." (Pl. Dep., Filing No. 42-1 at 72:1-74:4.) In her own deposition testimony Cox stated that she understood the term "culture," as used in the context of the performance appraisal, to mean that "First National [is] a relationship-based organization, and that as a new employee, Cox should focus on building relationships." (Pl. Dep., Filing No. 42-1 at 74:2-4.) Also, during her deposition Cox was asked if she would agree that "the culture of [First National] is relationship driven?"; Cox answered "Yes." (*Id.* at 82:21-23.)

Although the term "culture" may have different meanings in different contexts, it is Cox's burden to prove pretext, and she has not demonstrated that Foutch's use of the term was a reference to Cox's sex or indicative of discriminatory animus. Even if the comment *was* a reference to Cox's sex, Foutch was not a decision maker; and his

---

[10] Foutch denies stating that Cox was more qualified than Doyle. (Foutch Dep., Filing No. 43-1 at 114:14-25.)

alleged comment was made to Cox after the promotion occurred, so the comment could not have influenced the decision maker, O'Neill.

In sum, viewing the evidence in the light most favorable to Cox, the only evidence of pretext is (1) the male-dominated composition of First National's leadership, and (2) a non-discriminatory comment by a non-decision maker after the decision was made. Such evidence of pretext is insufficient as a matter of law.

## CONCLUSION

Viewing the disputed facts in the light most favorable to Cox, no genuine issues of material fact remain for trial, and judgment as a matter of law will be entered in favor of First National. Accordingly,

IT IS ORDERED:

1. First National's Motion for Summary Judgment (Filing No. 40) is granted;

2. The above-captioned action will be dismissed with prejudice;

3. All pending motions are denied as moot; and

4. A separate judgment will follow.

Dated this 30th day of July, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge